CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

GEORGE O. HAGEMAN (CABN 332457)
JARED S. BUSZIN (NYBN 5285838)
Assistant United States Attorneys

60 South Market Street, Suite 1200
San Jose, California 95113
Telephone: (408) 535-5044
FAX: (408) 535-5081
George.Hageman@usdoj.gov
Jared.Buszin@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAUL CORONEL SUAREZ aka "Ray."<br><br>Defendant. | **Case No. 5:24-CR-00226-BLF-008**<br><br>**UNITED STATES' SENTENCING MEMORANDUM**<br><br>Court: Hon. Beth Labson Freeman<br>Hearing Date: August 11, 2026<br>Hearing Time: 9:00 AM |

## I. INTRODUCTION

During the relevant time period, Raul Coronel Suarez was one of the most prolific and violent shooters within the Salinas Acosta Plaza (SAP) Norteño street gang. Coronel Suarez was involved in six separate shooting incidents between January 2023 and April 2024 aimed at increasing his standing within the gang and bolstering SAP's reputation on the street. During four of the shootings, Coronel Suarez fired at either rival Sureño gang members or former Norteño gang members (dropouts). During the two other shootings, Coronel Suarez participated and assisted the shooters. Several individuals were struck by gunfire during these six shootings, included two individuals who were killed and one individual who was hit by a stray bullet and paralyzed, though neither death resulted from shots directly fired by Coronel Suarez. Coronel Suarez committed these shootings as an adult—between ages 19 and 20—shortly before his federal arrest in May 2024. He was also involved in drug trafficking in July 2023 in furtherance of SAP's activities. Based on the need for the sentence to reflect the nature and circumstances of the offense, the history and characteristics of the defendant, and to protect the public, the government submits that 360 months' (30 years) imprisonment is sufficient, but not greater than necessary, to achieve the goals set forth in 18 U.S.C. § 3553(a). If accepted, this sentence would represent the highest issued so far in this case; the next highest sentence after Coronel Suarez has been 22 years in prison.

## II. PROCEDURAL HISTORY

On April 18, 2024, the defendant and ten other members of SAP were indicted by a federal grand jury on one count of racketeering conspiracy in violation of 18 U.S.C. § 1962(d). Dkt. 1. On January 27, 2026, the defendant pleaded guilty. Dkt. 451. Sentencing is currently set for August 11, 2026.

## III. OFFENSE CONDUCT

### a. *The Enterprise: Salinas Acosta Plaza (SAP)*

SAP is a criminal street gang that operates in Salinas, CA, within the larger collection of Norteño criminal street gangs that align with the Nuestra Familia (NF) prison gang and funnel taxes and proceeds from their crimes on the street to Nuestra Familia gang members in prison. Norteño gang members associate with the color red, and the number "14" (signifying "N" as the 14th letter of the alphabet), including any variations of the number such as "4" and "XIV." PSR ¶ 11.

SAP originated in the 1990's in the Acosta Plaza apartment complex in Salinas at and around the

900 block of Acosta Plaza. The gang claims that apartment complex as its territory. SAP commonly uses the letters and numbers "SAP," "A," "P," "900" and "914," as well as the color red, to identify itself. SAP members also commonly wear clothing of the Atlanta Braves and Philadelphia Phillies baseball teams to represent the gang, given that the symbols of these teams prominently feature the letters "A" and "P". *Id.* ¶ 12. These symbols are commonly, though not universally, displayed by SAP members in tattoos, graffiti, drawings, hand signs, on clothing, and in photos, rap videos, and social media posts as a way of displaying their affiliation, loyalty, and commitment to the gang. *Id.* ¶ 13.

SAP's primary rivals are Sureño gang members. *Id.* ¶ 14. Sureños recognize the primacy of the Mexican Mafia prison gang, doing the bidding and following orders of Mexican Mafia members. For symbols, they claim the color blue and the number 13 (M is the 13th letter of the alphabet). The rivalry between Norteño and Sureño gang members in Salinas has resulted in numerous acts of violence, including murders, attempted murders, shootings, and assaults. Additionally, SAP members very often target victims who they perceive to be Sureño gang members but who are not actually gang-affiliated, which has led to several murders and attempted murders of non-gang-affiliated victims.

In order to gain entry into the gang, aspiring SAP members may be encouraged or required to put in "work," which is understood to mean criminal conduct such as shootings, robberies, and drug sales. SAP members gain admission, earn status and respect, and rise in rank by committing criminal acts that benefit the gang and/or by spending time in jail or prison for the same. *Id.* ¶ 15. SAP members engage in acts of violence, including acts involving murder and assault, against their rivals and, at times, fellow Norteños considered to have violated the gang's rules. SAP members also traffic in controlled substances and firearms. Violence is often the quickest way to gain admission and/or status for the individual gang member. Members are also expected to pay dues to the gang, with greater dues required of those members who traffic in controlled substances. The dues are used, in part, to acquire firearms for distribution, possession, and use by SAP members. *Id.*

SAP members meet and work together to carry out illegal activities for the benefit of SAP and its membership, and also to benefit, more generally, the Norteños and the NF. SAP members fight with other street gangs for control of territory from which they conduct drug trafficking and other crimes, and recruit and intimidate non-gang members. SAP members engage in acts of violence and intimidation to control

illegal activities, to claim or maintain established territory, to retaliate against a rival gang or suspected rival gang member, to earn notoriety and respect, to dissuade potential victims and witnesses from reporting crime or cooperating with law enforcement, to discipline fellow gang members, and to send a message to others that they are strong, powerful, and not to be provoked. *Id.* ¶ 16.

b. *Defendant's Role in SAP*

From at least mid-2022 and continuing through at least April 2024, the defendant had been associated with Norteño criminal street gangs. *Id.* ¶ 18. He became an associate and then a member of the Salinas Acosta Plaza Norteños. During this time, he agreed to conduct and to participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity. As an Enterprise member, he knew and agreed that Enterprise members would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise, including acts involving murder, robbery, narcotics trafficking, and witness intimidation, in furtherance of the Enterprise and its interests. He wore clothing with the color red, he has tattoos of one dot and four dots on his elbows (signifying 14 because "N" is the 14th letter of the alphabet) and "DOK" on his head (signifying "dropout killer"), he flashed "A" and "P" hand signs, and he incorporated the number 16 into his social media profiles (because "P" is the 16th letter of the alphabet) to demonstrate his membership in, and promotion of, SAP.

On January 23, 2023, when he was 19 years old, the defendant and another SAP gang member were driving through a Sureño-affiliated neighborhood adjacent to Acosta Plaza when they spotted people whom they believed were rival Sureño gang members. *Id.* ¶ 19. They got into an argument and shouted "Plaza boys" at them before driving away. They parked their vehicle and then returned on foot wearing dark-colored hoodies and face masks. They spotted two men whom they believed were the ones who they had seen earlier. They approached them, and both fired at least 25 shots with the intent to hit the targets. They then ran back towards Acosta Plaza. The defendant acknowledged that neither of them hit the victims, but a dog was grazed by a bullet. He admitted that he participated in this shooting in order to increase his standing within SAP and to bolster SAP's reputation on the street.

On March 20, 2023, when the defendant was 19 years old, he and another SAP gang member spotted a suspected Sureño gang member who was homeless in the Carr Lake area adjacent to Acosta Plaza. *Id.* ¶ 20. The defendant approached and fired six shots at him. He acknowledged that he hit the

victim in the legs, torso, and elbow, but the victim survived. He admitted that he participated in this shooting in order to increase his standing within SAP and to bolster SAP's reputation on the street.

On April 26, 2023, when the defendant was 19 years old, he and another SAP gang member observed a former member of the Norteño gang (a dropout) walking his bicycle through Acosta Plaza. *Id.* ¶ 21. They approached him and challenged his gang affiliation, and then the defendant fired several shots at the victim. The defendant acknowledged that he hit the victim in the shoulder, but the victim survived. He admitted that he participated in this shooting in order to increase his standing within SAP and to bolster SAP's reputation on the street.

On May 20, 2023, when the defendant was 19 years old, two other SAP gang members spotted a man they believed to be a former member of the Norteño gang (a dropout) sitting in his vehicle near Acosta Plaza. *Id.* ¶ 22. Those two SAP gang members walked up to the vehicle and fired several shots into it. Afterwards, they ran back to the defendant's vehicle and Coronel Suarez drove them away from the scene. The defendant agreed that he was involved in the planning beforehand and that he drove the other gang members with the intent to help them avoid law enforcement detection. He acknowledged that the victim died, and that two other individuals were hit by stray bullets (paralyzing one of them).

On July 16, 2023, when the defendant was 19 years old, he knowingly possessed approximately 7.85 grams of methamphetamine and 7.16 grams of cocaine with the intention of selling them to another person. *Id.* ¶ 23. At the time, he was also in possession of a 9mm firearm. The defendant knowingly possessed these controlled substances with the intention of selling them to another person. To arrange the sale of these controlled substances, he would place phone calls, send text messages, and use social media applications on his smartphone. The defendant intended to sell these drugs for personal profit and to pay gang dues to SAP leaders. He agreed that his involvement in drug trafficking affected interstate and foreign commerce.

On December 2, 2023, when the defendant was 19 years old, as he was returning home to Acosta Plaza from attending school near Sacramento, he and another individual observed a former member of the Norteño gang (a "dropout") moving furniture in Acosta Plaza. *Id.* ¶ 24. Dropping out of the Norteños is against the gang's rules and is punishable by death. Those who kill Norteño dropouts are praised as "dropout killers" and help to bolster the gang's reputation on the street. After observing this man for a

few minutes, another SAP associate (Jose Saldana) and the defendant retrieved firearms, and they both returned to the area where the man was moving the furniture. Saldana ran up to the man and shot him several times in the neck, torso, arm, and leg. The defendant acknowledged that the man subsequently died. He admitted that he helped plan the murder in advance, and that he was present to observe it and later vouch for Saldana who had completed this act of violence in order to become a "certified" member of SAP. He admitted that he participated in this shooting in order to increase his standing within SAP and to bolster SAP's reputation on the street.

On April 22, 2024, when the defendant was 20 years old, he was walking on the street near Acosta Plaza wearing a dark-colored hoodie and a facemask when he observed a man whom he recognized as a rival Sureño gang member sitting in his car stopped at a red light. *Id.* ¶ 25. The defendant approached his car and fired nine shots at the victim, intending to hit him. The victim sped away and lost control, crashing into a parked car. The defendant ran back towards Acosta Plaza. The defendant sent messages about the shooting to another SAP member on Instagram. He acknowledged that the man was not hit. He admitted that he participated in this shooting in order to increase his standing within SAP and to bolster SAP's reputation on the street.

## IV. SENTENCING GUIDELINES CALCULATION

Pursuant to the plea agreement, the government agrees that the total offense level is 42 after acceptance of responsibility. *See* Dkt. 451 ¶ 7. The government agrees with Probation that he is in Criminal History Category II. PSR ¶ 106. Together, the guidelines range is 360 months to life. *See id.* ¶ 147. The statutory maximum is life. *See* 18 U.S.C. § 1963(a).

## V. APPLICABLE LAW

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The Court should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the Guidelines. *Id.* After determining the appropriate Guidelines calculation, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in Section 3553(a). *Carty*, 520 F.3d at 991-93.

Under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence for the defendant, the Court

should consider these factors applicable to this case, among others: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense; (3) the need for the sentence to afford adequate deterrence; (4) the need for the sentence to protect the public from further crimes of the defendant; (5) the need for the sentence to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

**VI. RECOMMENDED SENTENCE AND SECTION 3553(a) FACTORS**

Upon consideration of the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553(a)—and in particular the need for the sentence to reflect the nature and circumstances of the offense, the need to afford adequate deterrence, the history and characteristics of the defendant, and to protect the public—the government respectfully recommends a sentence of 360 months' (30 years) imprisonment. This would represent the highest sentence issued so far in this case; the next lowest is co-defendant Jose Saldana at 22 years.

*a. Targeting Gang Dropouts*

Three of the shootings here targeted men who had dropped out of the Norteño gang. That is, the targeted individuals had spent at least some time in the same gang as the defendant, but they had tried to move on with their lives. The decedent on December 2, 2023, for example, was killed while he was moving furniture in Acosta Plaza. He certainly knew the danger of dropping out of the Norteños in the first place—it is, after all, a common rule across all Norteño subsets that dropouts are to be attacked—and he surely knew the danger of going into a known gang stronghold like Acosta Plaza that afternoon, but he did it anyway for his livelihood and for the sake of his family. The defendant spotted him in Acosta Plaza when he (the defendant) was on his way back from attending school in Sacramento. The defendant too was trying to better himself by getting an education, yet instead of moving on with his life as the victim had done, the defendant decided to go in another direction: helping plan and assist with the dropout's murder. Jose Saldana, the gang member who actually shot the victim, was sentenced earlier to 22 years for this and other criminal activity. The defendant's actions seeking to punish anyone who chose to leave

the criminal enterprise was a pattern: the April 26, 2023, and May 20, 2023 shootings also targeted Norteño dropouts. The defendant memorialized this pattern with a permanent tattooed of "DOK" on his head, signifying "dropout killer." PSR ¶ 18.

*b. Age at the Time of the Offense*

Unlike some of the other defendants in this case, all of the defendant's shootings took place while he was an adult. Nevertheless, he was still a young adult at the time: 19 years old for the majority of the charged conduct, 20 years old for the April 22, 2024, shooting, and 22 years old now. While the age policy statement was deleted from the Sentencing Guidelines as of November 1, 2025, the underlying principles remain and may still be considered under 18 U.S.C. § 3553(a)(1) as "history and characteristics of the defendant." *See* U.S.S.G. § 5H1.1 (2025). Those principles include the fact that his brain is still developing, he is more impulsive, and he is more susceptible to outside influences. *See generally* U.S.S.G. § 5H1.1 (2024). Growing up, the defendant was primarily raised by his father and stepmother, and he endured verbal and physical abuse by them. *See* PSR ¶¶ 120-121. Additionally, he faced the challenge of being raised in a neighborhood that had a high rate of crime and violence including shootings and gang activity (including witnessing a triple homicide at the age of 13). *See id*. ¶¶ 122-23. He went to juvenile hall at the age of 15 and was periodically in custody thereafter. *Id*. ¶ 123. Age is not an excuse. Nor is a difficult childhood. But they are relevant factors under 18 U.S.C. § 3553(a).

c. *Protection of the Public*

Looking at the defendant's record, there are both concerning and promising signs. On the one hand, at the time of his arrest, he was attending school and working full-time. *Id*. ¶¶ 136, 140. He has expressed a desire to continue his educational and vocational development while incarcerated and provide a better life for his son. *Id*. ¶ 125. That takes dedication, and it is evident that he was working hard to improve his circumstances. By accepting responsibility as part of his plea agreement, he helped provide closure to his victims. The defendant has signaled a capacity to be better for himself and for his son. On the other hand, he played an active role in SAP and harmed a significant number of victims over an extended period of time without regard to the harm his actions caused in the community. If the court accepts the parties' recommended sentence, the defendant will be approximately 50 years old at the time of his release, and therefore, he will have aged out of the period when most people commit violent crimes.

## VII. VICTIM IMPACT AND RESTITUTION

Despite its outreach efforts, the government has not received any victim impact statements pertaining to the time period in which the defendant was involved in the racketeering conspiracy. The government is also not aware of any victims who wish to speak at sentencing, or any restitution requests at this time. If any are received prior to or at sentencing, the government will inform the Court.

## VIII. CONCLUSION

Raul Coronel Suarez is the most violent and prolific shooter among the Salinas Acosta Plaza (SAP) Norteños in this case. He has pled guilty to pulling the trigger on four separate occasions. That harm can never be undone, and it fully merits a lengthy term of imprisonment. Balancing that with some of the other factors here—including his age at the time, his age now, and his acceptance of responsibility—leads the government to recommend a sentence of 360 months (30 years). The government hopes that this sentence will put the defendant on a corrective course and that once he is released many years from now, no longer a young man, he will get himself on the right track and start contributing positively to society just as his victims had been trying to do.

DATED: August 4, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

/s/ ____________________
GEORGE O. HAGEMAN
JARED S. BUSZIN
Assistant United States Attorneys

/s/ ____________________
ELEANOR SCHROEDER
Certified Law Clerk